Filed 6/9/23 P. v. Montanez CA5
Opinion on transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSE ANTONIO MONTANEZ,<br><br>Defendant and Appellant. | F082023<br><br>(Super. Ct. No. PCF344311)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Tulare County. Michael B. Sheltzer, Judge.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Sally Espinoza, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Poochigian, Acting P. J., Meehan, J. and Snauffer, J.

Defendant Jose Antonio Montanez was convicted of possession of a firearm by a felon, possession of ammunition by a felon, and carrying a concealed firearm in a vehicle. We receive the matter on transfer from our Supreme Court.

When his direct appeal first reached us, defendant contended that the parole search that led to the discovery of the firearm and ammunition was unlawful because it was preceded by a detention without reasonable suspicion of wrongdoing in light of the officer's use of his patrol vehicle spotlight and request for identification. We declined to determine whether the interaction was a detention, and concluded, assuming the officer unlawfully detained defendant, the attenuation doctrine applied, and the evidence need not have been excluded.

Our Supreme Court granted review and deferred consideration pending dispositions in *People v. McWilliams* (2023) 14 Cal.5th 429 (*McWilliams*) and *People v. Tacardon* (2022) 14 Cal.5th 235 (*Tacardon*). With both cases now decided, the matter was transferred to us with directions to vacate our prior opinion and reconsider. We permitted the parties to submit supplemental briefing. They agree that the case turns on whether defendant was detained prior to the officer learning of defendant's parole status. Defendant contends that he was detained when the officer illuminated his vehicle with a patrol vehicle spotlight and asked for his identification. The People disagree. We vacate our prior opinion and affirm.

## PROCEDURAL SUMMARY

On January 24, 2019, the Tulare County District Attorney filed a first amended information charging defendant with possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1);[1] count 1), possession of ammunition by a felon (§ 30305, subd. (a)(3); count 2), carrying of a concealed firearm in a vehicle (§ 25400, subd. (a);

---

[1] All further statutory references are to the Penal Code.

2

count 3), and failure to appear (§ 1320, subd. (b); count 4). As to each count, the information further alleged defendant had suffered a prior serious felony "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and had served a prior prison term (§ 667.5, subd. (b)).

On January 17, 2020, the trial court found defendant guilty on counts 1 through 3. Defendant's "RAP" sheet, detailing his prior strike conviction, was also admitted.

On September 29, 2020, the trial court sentenced defendant to a total term of 32 months as follows: on count 1, 32 months (the low term of 16 months doubled due to the prior strike conviction); and on counts 2 and 3, 32 months (the low term of 16 months doubled due to the prior strike conviction) concurrent with the term on count 1. No prior prison term enhancements were imposed.

On March 30, 2022, this court filed an opinion affirming the judgment. (*People v. Montanez* (Mar. 30, 2022, F082023) [nonpub. opn.].)

On June 29, 2022, our Supreme Court granted review and deferred further action in the matter pending consideration and disposition of related issues in *McWilliams* and *Tacardon*. (*People v. Montanez*, review granted June 29, 2022, S274306.)

On May 3, 2023, our Supreme Court transferred the matter to us with directions to vacate our opinion and reconsider in light of *McWilliams*, *supra*, 14 Cal.5th 429, and *Tacardon*, *supra*, 14 Cal.5th 235.

## FACTUAL SUMMARY[2]

On April 24, 2017, the trial court held a hearing on defendant's motion to suppress evidence pursuant to section 1538.5.

---

**2** Because the issues before us relate only to suppression of evidence, we provide a summary only of the facts presented at the hearing on defendant's initial motion to suppress.

3

On December 4, 2016, at approximately 2:30 a.m., Tulare County Sheriff's Deputy Brian Pinheiro was on patrol duty when he noticed a lone vehicle parallel parked along the shoulder of the road in an area known for high drug and alcohol use. He parked his marked patrol car behind the vehicle, used his spotlight to illuminate the vehicle, and approached the vehicle. He explained that he used the spotlight "due to the dark hours" in an effort to "make [his] approach safer." He did not activate his emergency lights. As he approached the vehicle, he noticed that the rear driver's side door was open and he saw defendant and a woman in the back seat.

Pinheiro asked defendant and the woman for their identification. Both produced driver's licenses. Pinheiro then "ran [defendant and the woman] through dispatch at which point [he learned defendant] was on active parole." The dispatcher informed Pinheiro that defendant's parole included search terms. Pinheiro then asked defendant to exit the vehicle; searched defendant for weapons, locating none; and conducted a search of the vehicle. In the vehicle, Pinheiro located a semiautomatic handgun, wrapped in a pair of pants that were located directly below where defendant's feet sat when Pinheiro contacted him. The handgun contained 10 rounds of ammunition.

Pinheiro arrested defendant and transported him to the Porterville sheriff's substation. After Pinheiro read defendant a *Miranda*[3] admonition, defendant admitted that the pants belonged to him. He further told Pinheiro that he had found the handgun earlier in the day.

On that record, the trial court concluded that the interaction between defendant and Pinheiro was consensual until Pinheiro conducted the parole search. On that basis, the court denied defendant's motion to suppress evidence.

---

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436.

On January 12, 2018, defendant renewed his motion to suppress and moved to set aside the information pursuant to section 995. The trial court summarily denied the motion.

## DISCUSSION

In defendant's original briefing, he argued that the contact between he and Pinheiro was at no point a consensual encounter. Instead, he argued, it was a detention without reasonable suspicion of wrongdoing from the outset. The People disagreed, arguing that the interaction was a consent encounter until Pinheiro discovered that defendant was on parole. Alternatively, the People argued that even if a Fourth Amendment violation occurred, the evidence obtained need not have been excluded based on the attenuation doctrine. We agreed with the People that even assuming a Fourth Amendment violation occurred—a question which we did not resolve—no exclusion of evidence was required.

On transfer from our Supreme Court, the parties submitted supplemental briefing in which they agree that this case turns on whether the initial interaction between defendant and Pinheiro was a consensual encounter or an unlawful detention. They agree, as do we, that if we conclude the initial interaction was an unlawful detention, *McWilliams* forecloses a conclusion that defendant's parole status was an intervening circumstance that could support the attenuation doctrine exception to the exclusionary rule. (*McWilliams*, *supra*, 14 Cal.5th at p. 435 [concluding that an officer's discretionary decision to conduct the parole search did not sufficiently attenuate the connection between the officer's initial unlawful decision to detain the defendant and the discovery of contraband].)

The parties continue to disagree regarding the nature of the initial interaction between defendant and Pinheiro. Defendant argues that by illuminating defendant's vehicle with a spotlight, "approach[ing] the vehicle on foot[,] immediately ask[ing] the

5

occupants for identification[,] and wait[ing] for dispatch to run their names," Pinheiro unlawfully detained him. The People agree regarding the facts in the record but contend that the interaction did not constitute a detention. We agree with the People.

### A. Standard of Review and General Legal Principles

Section 995 authorizes a court to set aside an information if (1) the defendant was not "legally committed by a magistrate" or (2) the defendant was committed "without reasonable or probable cause." (§ 995, subd. (a)(2)(A) & (B).) "Probable cause exists if a person ' " ' "of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion" ' " ' that the defendant committed the crime." (*Galindo v. Superior Court* (2010) 50 Cal.4th 1, 8.) An information is not appropriately set aside " 'if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654.) "This is an 'exceedingly low' standard …." (*People v. Superior Court (Sahlolbei)* (2017) 3 Cal.5th 230, 245.)

"Where, as here, the defendant challenges the suppression ruling by a motion to dismiss under Penal Code section 995, we review the determination of the magistrate who ruled on the motion to suppress, not the findings of the trial court." (*People v. Fews* (2018) 27 Cal.App.5th 553, 559; accord, *Tacardon*, *supra*, 14 Cal.5th at p. 242.) " '[I]n proceedings under section 995 it is the magistrate who is the finder of fact; the superior court has none of the foregoing powers, and sits merely as a reviewing court; it must draw every legitimate inference in favor of the information, and cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate. [Citation.] On review by appeal or writ, moreover, the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate ….' " (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141; accord, *Tacardon*, at p. 242.) We do not substitute our own judgment for that of the committing magistrate

6

concerning the weight of the evidence or the credibility of the witnesses. (*People v. Block* (1971) 6 Cal.3d 239, 245; *Tacardon*, at p. 242.) However, " 'where the facts are undisputed, the determination of probable cause "constitute[s] a legal conclusion which is subject to independent review on appeal." ' " (*People v. Black* (2017) 8 Cal.App.5th 889, 898.) " 'Insofar as the … section 995 motion rests on issues of statutory interpretation, our review is de novo.' " (*Gonzalez*, at p. 1141.)

We will uphold the magistrate's ruling if it "is correct on any theory of the law applicable to the case, even if the ruling was made for an incorrect reason." (*People v. McDonald* (2006) 137 Cal.App.4th 521, 529.)

The federal and California Constitutions prohibit unreasonable searches and seizures. (U.S. Const., 4th & 14th Amends.; Cal. Const., art. I, § 13.) California law applies federal constitutional standards to the review of search and seizure rulings. (*People v. Rogers* (2009) 46 Cal.4th 1136, 1156, fn. 8.) Under section 1538.5, a trial court may grant a motion to suppress evidence "only if exclusion is mandated by the federal Constitution." (*People v. Banks* (1993) 6 Cal.4th 926, 934.) The initial burden is on the defendant to establish that the government conducted a search without a warrant. The burden then shifts to the prosecution to justify the warrantless search. (*People v. Williams* (1999) 20 Cal.4th 119, 127.) A warrantless search is presumptively unreasonable. (*Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646, 652–653.) The prosecution must prove by a preponderance of the evidence the search falls within an exception to the Fourth Amendment's warrant requirement. (*People v. Torres* (1992) 6 Cal.App.4th 1324, 1334–1335.)

### B.  Purported Fourth Amendment Violation

Not all contacts between civilians and law enforcement constitute searches and seizures. " 'An officer may approach a person in a public place and ask if the person is willing to answer questions. If the person voluntarily answers, those responses, and the

officer's observations, are admissible in a criminal prosecution. [Citations.] Such consensual encounters present no constitutional concerns and do not require justification. [Citation.] However, "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen," the officer effects a seizure of that person, which must be justified under the Fourth Amendment to the United States Constitution. [Citations.] In situations involving a show of authority, a person is seized "if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,' " or " 'otherwise terminate the encounter' " [citation], and if the person actually submits to the show of authority.' " (*Tacardon*, *supra*, 14 Cal.5th at p. 241.)

"We consider the totality of the circumstances in determining whether a detention occurred." (*Tacardon*, *supra*, 14 Cal.5th at p. 241.) "Relevant circumstances may include: the presence of multiple officers, an officer's display of a weapon, the use of siren or overhead emergency lights, physically touching the person, the use of a patrol car to block movement, … the use of language or of a tone of voice indicating that compliance with the officer's request is compelled[]" (*id*. at pp. 241–242), "the time and place of the encounter, whether the police indicated the defendant was suspected of a crime, whether the police retained the defendant's documents, and whether the police exhibited other threatening behavior" (*People v. Linn* (2015) 241 Cal.App.4th 46, 58 (*Linn*)). "Questions by an officer of a sufficiently accusatory nature may 'be cause to view an encounter as a nonconsensual detention.' [Citation.] The same is true for commands or directions issued in the course of an encounter." (*Linn*, at p. 58.)

In *Tacardon*, our Supreme Court addressed a situation very similar to the case at bar. In the evening, an officer was on patrol in a marked car, in an area known for narcotics sales and weapons possession. (*Tacardon*, *supra*, 14 Cal.5th at p. 238.) The officer drove past a vehicle legally parked in front of a residence, in the vicinity of a

8

streetlight. (*Ibid.*) The vehicle's engine and headlights were off, and "smoke emanated from slightly open windows." (*Id.* at pp. 238–239.) The officer saw three people in the vehicle. (*Id.* at p. 239.) The officer made a U-turn, parked "about 15 to 20 feet behind" the vehicle, and turned on his spotlight. (*Ibid.*) "He did not activate his siren or emergency lights or issue any commands to the [vehicle]'s occupants. He sat in his patrol car for 15 to 20 seconds while he informed dispatch of his location. He then approached the [vehicle] at a walking pace. He did not draw a weapon." (*Ibid.*)

As the officer approached the vehicle, a woman in the back seat " 'jumped out' " and walked toward the back of the vehicle. (*Tacardon*, *supra*, 14 Cal.5th at p. 239.) When asked what she was doing, she told the officer that she lived there. (*Ibid.*) The officer directed the woman to stand near the sidewalk behind the vehicle where he could see her. (*Ibid.*) "He spoke in a calm and moderate voice and did not draw a weapon." (*Ibid.*)

The officer then continued to the vehicle and smelled marijuana smoke coming from inside the vehicle. (*Tacardon*, *supra*, 14 Cal.5th at p. 239.) He used his flashlight to illuminate the interior of the vehicle and saw three plastic bags on the rear passenger floorboard that contained "a green leafy substance." (*Ibid.*) The defendant sat in the driver's seat. (*Ibid.*) Upon the officer's request, both the defendant and the front seat passenger identified themselves. (*Ibid.*) Only the passenger produced an identification card. (*Ibid.*) The officer saw a partially burned, hand-rolled cigarette in the center console. (*Ibid.*) He asked the defendant about the cigarette and the leafy substance in the bags. (*Ibid.*) He also asked the defendant whether he was on probation or parole. (*Ibid.*) The defendant said that he was on probation. (*Ibid.*) The entire discussion lasted two to three minutes. (*Ibid.*)

The officer then told the defendant to remain seated and returned to his patrol car to perform a records search. (*Tacardon*, *supra*, 14 Cal.5th at p. 239.) The officer

9

confirmed that the defendant was on probation and searched the vehicle, discovering cash, marijuana, and hydrocodone pills. (*Ibid*.)

On that record, our Supreme Court had occasion to consider "how the use of a spotlight affects the analysis of whether a detention took place." (*Tacardon*, *supra*, 14 Cal.5th at p. 243.) It explained that "the use of a spotlight generally conveys a different meaning to a reasonable person than the use of a patrol car's emergency lights. Red and blue lights are almost exclusively reserved for emergency and police vehicles. [Citations.] An officer's use of flashing red lights, or combination of red and blue lights, behind a vehicle typically conveys a command to stop." (*Id*. at p. 246.) "By contrast, a reasonable person would understand that spotlights can have a practical function that differs from the essentially communicative function of emergency lights. A spotlight can be used to illuminate the surrounding area for safety or other purposes unrelated to the projection of authority. Proper illumination enhances the officer's ability to make ' "swift, on-the-spot decisions" ' that are appropriate to the circumstances. [Citations.] And, in certain circumstances, depending on how the spotlight is used, it might help both the officer and the civilian see what the other is doing and make decisions accordingly." (*Id*. at pp. 246–247, fn. omitted.) Our high court therefore concluded that "a reasonable person would distinguish between a spotlight and red and blue emergency lights in considering whether the person was free to leave or otherwise terminate the encounter." (*Id*. at p. 247.)

In short, "use of a spotlight, standing alone, does not necessarily effect a detention." (*Tacardon*, *supra*, 14 Cal.5th at p. 247.) Our Supreme Court also made clear, however, that it declined to state a bright-line rule. It considered hypothetical situations in which a spotlight could be used in an authoritative manner: by flashing lights at the driver to pull the vehicle over or attempting to blind the driver. (*Ibid*.) It then concluded that the spotlight was not used in an authoritative manner in the case before it. (*Id*. at

10

p. 251.) The officer's non-rapid "nighttime approach, aided by a spotlight for illumination," that did not involve posing of any questions or any accusations, "did not, without more, effect a detention."[4] (*Id.* at p. 251.)

Here, defendant argues that, under the totality of the circumstances, he was detained prior to Pinheiro learning of his parole status because Pinheiro parked his patrol car behind defendant's vehicle, illuminated defendant's vehicle, approached the vehicle on foot, and requested identification from defendant. We disagree.

First, as decided by our Supreme Court in *Tacardon*, a person is not detained when an officer "park[s] behind [a parked vehicle (so long as the officer does not block the vehicle in)], shine[s] a spotlight on it [(so long as the officer does not use the spotlight in an authoritative manner)], and beg[ins] to approach on foot" (so long as the officer does not approach rapidly). (*Tacardon*, *supra*, 14 Cal.5th at p. 247; see *People v. Kidd* (2019) 36 Cal.App.5th 12, 21, disapproved on other grounds by *Tacardon*, at pp. 247, 251 ["Without more, a law enforcement officer simply parking behind a defendant would not reasonably be construed as a detention."]) Here, the trial court found that defendant was "parked parallel on the side of the road." Pinheiro did not block defendant's car "in a parking stall" or otherwise block his ability to drive away. Nor does the record suggest that Pinheiro rapidly approached defendant's vehicle. Indeed, the record contains no evidence regarding the speed of Pinheiro's approach.[5] Further, the record demonstrates

---

**4** Our Supreme Court did not resolve the ultimate question of whether a detention was effected in *Tacardon* because the record was not developed regarding whether the defendant had observed the officer detain the female passenger who exited the vehicle as the officer approached. (*Tacardon*, *supra*, 14 Cal.5th at pp. 253–254.) Because the record on that issue was not developed, our Supreme Court also did not consider the effect of the officer asking the defendant for identification, which took place after the detention of the female passenger.

**5** The record indicates that Pinheiro "r[a]n the plates" on defendant's vehicle. Based on the order of questions, it appears that he did so prior to approaching defendant's vehicle but the record is not clear on that point.

that the spotlight was not used in an authoritative manner—such as positioning it to blind the driver or flashing it at the vehicle as a means of indicating to the driver to pull over. Pinheiro testified that he used the spotlight "due to the dark hours" and "[t]o illuminate [Pinheiro's] vehicle to make [the] approach safer."

Second, a police officer's merely *asking* a person for identification does not necessarily implicate the Fourth Amendment, even if the officer does not immediately return the proffered identification card. (*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.* (2004) 542 U.S. 177, 185; *Florida v. Bostick* (1991) 501 U.S. 429, 434–435; *Linn*, *supra*, 241 Cal.App.4th at pp. 59–61.) On the other hand, a police officer's *order* or *demand* that a person provide their identification suggests that compliance is required, and the person is not free to leave. (See *Bostic*, at pp. 434–435 [a request for identification is not a consensual encounter where the officer suggests that compliance is required]; *People v. Leath* (2013) 217 Cal.App.4th 344, 353 [holding that an encounter was consensual where the officer "asked for—but did not demand—identification"].) Here, Pinheiro was asked if he "ask[ed defendant] for identification"; he responded, "Yes." On that record, it appears that Pinheiro requested and defendant voluntarily produced his identification card. The trial court so concluded at the suppression hearing: "It is lawful, a consensual encounter for the officer to seek identification … and [defendant] voluntarily complied." That circumstance tends to indicate that the encounter was consensual and not a detention.

Third, the *Tacardon* court discussed the impact of an officer asking the defendant investigative questions or accusing the defendant of wrongdoing. (*Tacardon*, *supra*, 14 Cal.5th at pp. 250–252.) Specifically, it considered *Wilson v. Superior Court* (1983) 34 Cal.3d 777, and *People v. Kasrawi* (2021) 65 Cal.App.5th 751, on that point. In *Wilson*, the officer told the defendant that he was conducting a narcotics investigation and had information suggesting that the defendant was carrying "a lot of drugs." (*Wilson*, at

12

p. 790, italics omitted; *Tacardon*, at p. 250.) "Common sense suggests … that in such a situation, an ordinary citizen, confronted by a narcotics agent who has just told him that he has information that the citizen is carrying a lot of drugs, would not feel at liberty simply to walk away from the officer." (*Wilson*, at p. 790; *Tacardon*, at p. 250.) Similarly, in *Kasrawi*, the officer parked within a few feet of the defendant's parked car, activated his spotlight, "immediately approached and walked to within a few feet of the defendant, asking him where he was coming from." (*Tacardon*, at p. 251, citing *Kasrawi*, at pp. 754–755.) The appellate court in *Kasrawi* concluded that the defendant was detained because "the officer parked within a few feet of the defendant's car; ' "bathed" ' the defendant with light; immediately approached with 'speed and surety,' …; and asked an immediate, pointed question, which demanded an answer." (*Tacardon*, at p. 251, citing *Kasrawi*, at pp. 759, 760.) Here, in contrast, the record is devoid of any indication that Pinheiro asked defendant any questions or suggested any wrongdoing. He merely requested defendant's identification and, based on the record, defendant voluntarily complied. Again, an officer merely asking for identification, even considering the use of a spotlight and other circumstances, does not transform a consensual encounter into a detention. (*Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, *supra*, 542 U.S. at p. 185; *Florida v. Bostick*, *supra*, 501 U.S. at pp. 434–435; *Linn*, *supra*, 241 Cal.App.4th at pp. 59–61.)

Under the totality of the circumstances, defendant was not detained prior to Pinheiro learning of defendant's parole status and search conditions. We therefore find no Fourth Amendment violation.[6]

## DISPOSITION

Our prior opinion is vacated. The judgment is affirmed.

---

**6** Because we find no Fourth Amendment violation, we need not consider application of the exclusionary rule or the attenuation doctrine.

13